**UNITED STATES DISTRICT COURT**
**THE NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ELIJAH VREELAND,<br><br>     Plaintiff,<br><br> v.<br><br>COUNTY OF ONONDAGA, TOBIAS SHELLY, official capacity; JOHN A. DRAPIKOWSKI, individual capacity; MICHAEL KOLAKOWSKI, individual capacity; ALTON APPLES, individual capacity; VEDAD HUJDUR, individual capacity; THOMAS FODARO, individual capacity; SCOTT MCDONALD, individual capacity; PETER FORSYTHE, individual capacity; JOSHUA CRUZ, individual capacity; DUSTIN SADDOCK, individual capacity,<br><br>    Defendants. | Case No.: 5:25-cv-108 (FJS/MJK)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff ELIJAH VREELAND ("Plaintiff" or "Elijah" "Mr. Vreeland"), by his counsel, The Law Offices of Eric Seifert, as and for this Complaint, alleges the following:

## I. NATURE OF THE ACTION

1. This is a civil rights action for compensatory and punitive damages, as well as declaratory relief under 42 U.S.C. § 1983 for violations of Plaintiff Elijah Vreeland's ("Elijah") rights under the First, Eighth and Fourteenth Amendments to the United States Constitution. Elijah similarly redresses his rights as a disabled citizen under the Americans with Disabilities Act, 42 U.S.C. § 12102 and as a disabled incarcerated inmate under New York's HALT act, N.Y. Corrections § 137.

2. Thus, Elijah seeks vindication for the egregious and inhumane treatment that

he received at the hands of Onondaga County Deputy Sheriffs and supervisory staff assigned to Onondaga County's correctional facility, the Patrick J. Corbett Justice Center ("Justice Center").

3.   As a person with a 'serious mental illness' detained on an eight month probation violation, Elijah, along with his fellow mentally disabled detainees, were relegated to unlawfully excessive periods of solitary confined conditions that were in blatant violation of both the Eighth Amendment and New York's HALT act, such that Elijah's psychiatric condition precipitously declined.

4.   The conditions of excessive confinement pressed Elijah to attempt suicide and harm himself on eight to ten separate occasions in 131 days, one of which incited Defendant deputies to vengefully attack him over his attempt.

5.   Despite his mental disability, Elijah had the wherewithal to advocate for both his own rights and the rights of his fellow disabled inmates housed alongside him within the 5C mental health unit.

6.   With the intention of obstructing Elijah from calling attention to the grave injustices and blatant discriminatory treatment unfolding within the 5C unit, Defendant deputies and the Center's chief thwarted Elijah's attempts at submitting grievances that articulated the constitutional and statutory violations unfolding at the unit.

7.   Thus, in response to Elijah's attempts to exercise his constitutionally protected right to grieve statutory and constitutional violations, Defendant deputies retaliated by, among other means, hindering Elijah from filing further grievances in hopes of chilling Elijah's unbridled desire put an end to the malicious and discriminatory conduct that was being perpetrated on himself and the other vulnerably disabled inmates on 5C.

8. On account of prior complaints, lawsuits, and grievances, the County and its Sheriff as final policymaker was very much apprised of the constitutionally and statutorily infirm customs and practices transpiring at the Justice Center. On account of its nonfeasance in response, the County displayed a deliberate indifference to such infirmities by refusing to take affirmative steps or actions, either in remediating the conditions befalling Elijah and the disabled inmates on 5C or in supervising, disciplining or training the deputy staff who were perpetrating such violations with impunity.

9. Accordingly, in addition to monetary compensation and punitive damages for Defendants' egregious constitutional violations, Elijah is additionally entitled to a declaration from this Court that Defendants' actions and omissions violated the United States Constitution and well accepted standards of human rights and common decency.

10. This court has jurisdiction of ELIJAH VREELAND's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and supplemental jurisdiction over state claims pursuant to 28 U.S.C. §§ 1367. Moreover, the Court can order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988. Remedies are hereunder sought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of Mr. Vreeland's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq.

11. Venue is proper within the United States District Court for the Northern District of New York pursuant to 28 U.S.C. 1391(b)(1) and (b)(2) because the named defendants have their official residence in this district and because the entirety of of the events constituting Mr. Vreeland's claims have taken place within this district while he was imprisoned at the County of Onondaga's Justice Center, Syracuse, New York.

# II. PARTIES

**Plaintiff**

12.     Plaintiff ELIJAH VREELAND (hereinafter "Elijah") is a twenty-seven year old resident of the State of New York who suffers from serious mental illness and was incarcerated in the County of Onondaga's Justice Center between approximately January 2, 2024 through June 18, 2024 where he was held in solitary confinement for 131 out of his 168 day incarceratory detention at the Justice Center. Elijah is a person with a disability as defined in 42 U.S.C. §12102, 29 U.S.C. § 705(9)(B).

**Defendants**

13.     Defendant, COUNTY OF ONONDAGA ("County") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department that acts as its agent in the area of law enforcement, for which it is ultimately responsible. The Onondaga County Sherriff's Office ("OCSO") is a sub-agency of Defendant County, which maintains and controls the Onondaga County Justice Center ("OCJC"), the detention facility in which Plaintiff was assaulted.

14.     Defendant, TOBIAS SHELLY is the Sheriff of Onondaga County and head of the OCSO, an administrative arm of the County. The Custody Department of the OCSO manages the Onondaga County Justice Center. Sheriff Shelly has final policy-making authority for the County for all policies that govern the Justice Center. Sheriff Shelly also has supervisory authority over the Justice Center and is personally involved in authorizing and maintaining the unlawful policies and customs challenged by Mr. Vreeland, including those relating to the application of constitutionally infirm practices with respect to solitary confinement, detention of mentally disabled inmates, grievance protocols, and training, supervision, and disciplining of Justice Center staff. Sheriff Shelly is sued in his official capacity.

15.    Defendant, JOHN DRAPIKOWSKI, (hereinafter "Chief Drapikowski") is the Chief Custody Deputy for the Onondaga County Sheriff's Office and is responsible for the management of the Justice Center and is personally involved in authorizing, maintaining, and enforcing the unlawful policies and customs challenged by Mr. Vreeland. At all relevant times described herein, Chief Drapikowski was acting under color of New York State law, and within the scope of his duties and employment. Drapikowski is sued in his official and individual capacity.

16.    Defendant, Hearing Officer Deputy MICHAEL KOLAKOWSKI, (hereinafter "Kolakowski") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Kolakowski was charged with imposing both the terms of solitary confinement and their periodic review and in so doing, was acting under color of New York State law, and within the scope of his duties and employment. Kolakowski is sued in his individual capacity.

17.    Defendant OCSO Sheriff Deputy ALTON APPLES, (hereinafter "Apples") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Apples was acting under color of New York State law, and within the scope of his duties and employment. Apples is sued in his individual capacity.

18.    Defendant, OCSO VEDAD HUJDUR, (hereinafter "Hujdur") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Hujdur was acting under color of New York State law, and within the scope of his duties and employment. Hujdur is sued in his individual capacity.

19. Defendant, OSCO Deputy THOMAS FODARO (hereinafter "Fodaro") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Fodaro was acting under color of New York State law, and within the scope of his duties and employment. Fodaro is sued in his individual capacity.

20. Defendant, OCSO Senior Deputy SCOTT MCDONALD (hereinafter "McDonald") was at all relevant times described herein an OCSO deputy working at the Justice Center who held supervisory duties as the Senior Deputy in charge of the Mental Health Unit 5C as employed by Defendant County. At all relevant times described herein, McDonald was acting under color of New York State law, and acting within the scope of his duties and employment. McDonald is sued in his individual capacity.

21. Defendant, OCSO Deputy PETER FORSYTHE (hereinafter "Forsythe") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Forsythe was acting under color of New York State law, and acting within the scope of his duties and employment. Forsythe is sued in his individual capacity.

22. Defendant, OCSO Deputy JOSHUA CRUZ (hereinafter "Cruz") was at all relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Cruz was acting under color of New York State law, and acting within the scope of his duties and employment. Cruz is sued in his individual capacity.

23. Defendant, OCSO Deputy DUSTIN SADDOCK (hereinafter "Saddock") was at all

relevant times described herein an OCSO deputy working at the Justice Center and employed by Defendant County. At all relevant times described herein, Saddock was acting under color of New York State law, and acting within the scope of his duties and employment. Saddock is sued in his individual capacity.

24.     Collectively, Defendants Drapikowski, Kolakowski, Apples, Hujdur, Fodaro, Saddock, McDonald, Forsythe, Cruz, are referred to as "Individual Defendants." At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

### III. STATEMENT OF FACTS

*Elijah's childhood*

25.     Elijah Vreeland ("Elijah"), an African American, was born in or about October 1, 1997. Elijah was born to a drug addicted mother who, on account of partaking in crack cocaine during her pregnancy, transferred that addiction to Elijah upon birth. On account of the unfitness of his biological mother, Elijah was placed up for adoption when Elijah was three months old. Elijah's then adopted mother fostered other children who, unbeknownst to Elijah's mother, sexually abused the young Elijah. At a young age, Elijah displayed signs of suffering from mental and emotional illness that further expressed itself as Elijah advanced in age.

26.     At eleven years old, Elijah, on account of his school truancy and uncontrollable classroom behavior, was placed in the William George Agency for Children's Services in Tompkins, N.Y. and thereafter, upon being diagnosed with bipolar disorder, severe depression, severe anxiety disorder, and suicidal ideation, was transferred to the Hillside Children's Center

in Rochester, NY. In order to control and treat his psychiatric and mental illness, Elijah had been proscribed upwards of fifteen high dose psychotropic medications.

27.     On more than several occasions, Elijah attempted suicide resulting in repeated involuntary commitments at hospitals such as Strong Memorial Hospital in Rochester, NY, St. Joseph's Health Hospital in Syracuse, NY, Clifton Springs Hospital, Clifton Springs, NY and Newark Wayne Hospital.

***Elijah's October 31, 2023 Arrest***

28.     On or about October 31, 2023 while experiencing a psychiatric crisis, Elijah called emergency services ("911") requesting a crisis team instead of law enforcement which Elijah was exceptionally terrified to assist and transport him to the Comprehensive Psychiatric Emergency Program ("CPEP") at St. Joseph's Hospital Syracuse, N.Y. After successfully being transported to St. Joseph's, an Onondaga Deputy Sheriff arrived to investigate an earlier incident where Elijah had purportedly sent threatening text messages to the mother of his son concerning his visitation rights.

29.     Paralyzed at the prospect of being taken into custody by law enforcement, Elijah, upon hearing that he would be taken into custody, hid behind the CPEP crisis team pleading that they first regulate his suicidal thoughts and psychosis before allowing him to be taken into custody. CPEP staff requested the opportunity to first stabilize Elijah before being taken into custody which the Sheriff Deputy viciously disregarded and aggressively pulled Elijah from the chair and dragged him to the waiting patrol car. Tossing Elijah into the patrol car, the Deputy Sheriff purposely slammed the patrol car's door onto Elijah's kneecap causing excruciating pain.

30.     Upon traveling to the precinct, Elijah was repeatedly hyperventilating and vomiting. Elijah pleaded for the windows to be opened to which Deputy patently ignored. Upon

arriving at the precinct, Elijah was unable to walk given his swollen and bloody kneecap. Upon being transported to the booking room, Elijah continued to vomit and desperately requested medical assistance. Given his vomit soiled clothing, Elijah requested a jumpsuit or other change of clothing which again, fell on law enforcement's deaf ears. Elijah was thus forced to wear the vomit strewn jumpsuit for two days.

***Elijah's probation remand and Jamesville Correction***

31.     Elijah was charged with aggravated harassment for the text messages and violation of the terms and conditions of his previously imposed probation. Although Elijah posted bail on or about November 1, 2023, he remained detained on a probation hold where, upon partaking in a revocation hearing, it was recommended that Elijah be remanded for violating his probation. During the pendency of these charges, Elijah was first housed at the Onondaga County Justice Center but soon thereafter, was transferred to the Onondaga County Department of Correction ("Jamesville"), Jamesville, NY.

32.     On or about November 28, 2023, while at Jamesville, Elijah attempted to inflict self-harm on multiple occasions in response to the taunting and withholding of hygiene. In response to Elijah's request to file a grievance against the Jamesville deputy, Deputy Sergeant Jason Ibert retaliated by threatening to inflict physical violence upon Elijah had he persisted in his request. As a way of responding to the Jamesville staff's violent and aggressive provocations, Elijah, on account of his psychiatric illness, inflicted self-harm by slamming his head against the walls, punching the steel cell doors, and attempting suicide by slicing his wrists with the metal material of his wristband. In response, Jamesville staff placed Elijah in a restraining chair facing a blank wall while shackled for seven hours without reprieve. Such cruel and unusual torturous

treatment of a serious mentally ill inmate catapulted Elijah into a severe psychotic breakdown causing his body to uncontrollably shake and urinate.

***Elijah's Arrival at Justice Center***

33.    Thereafter, in response to Elijah's repeated attempts to harm himself, in or about January 2, 2024, Jamesville transferred Elijah back to the Onondaga County Justice Center, a jail that housed detainees who repeatedly engaged in assaultive behavior and as such, was purportedly 'better prepared' to protect Elijah from harming himself. Upon arriving to the Justice Center, Elijah requested medical assistance for his hand which was broken on account of his suicidal onslaught days earlier when he punched his jail cell's metal bars. This request for medical assistance for his broken hand was consistently ignored and refused throughout the next four months of his detention at the Justice Center.

34.    On or about February 2, 2024, Elijah plead guilty to violating probation and was sentenced to a one-year jail sentence. Upon being transferred from Jamesville, the Justice Center's unit heads, supervisors and CO staff within both the protective custody unit where Elijah was first held and the 5C Mental Health Unit where Elijah was transferred soon thereafter were well apprised that Elijah was acutely suicidal and designated as severely mentally disabled with diagnosis' of bipolar disorder, severe depression, severe anxiety disorder, and suicidal ideation,

***Elijah's February 9, 2024 suicide attempt and responsive excessive force***

35.    During the approximately four weeks after Elijah had been transferred to the Justice Center and housed in the unconfined special housing unit, Elijah's mental and emotional state was somewhat stabilized on account of his now regulated medication regimen. Unfortunately, things abruptly unraveled on February 9, 2024. On that day, and in response to Elijah's requests to shower in order to prepare for an upcoming video visit, Deputy John Rapp

rejected Elijah's request and in response to his protestations, revoked Elijah's video visit privileges.

36.     In response, Elijah vehemently requested the opportunity to speak with the Sergeant on duty in order to file a grievance to which Deputy Rapp flippantly dismissed. Enraged at Deputy Rapp's impertinency, Elijah felt an impending psychotic break and requested mental health assistance which again, Deputy Rapp patently ignored. Given Elijah's designated mental health status, 'seriously mentally ill' and proclivity towards self-harm and suicide, Justice staff, including Deputy Rapp were well apprised of such history as a standing order existed that Elijah was to undergo welfare checks every fifteen minutes.

37.     Thus, each time Deputy Rapp conducted a welfare check, Elijah would reassert his request to file a grievance which Rapp repeatedly disregarded and ignored. After being rebuffed several times, Elijah, now in a full blown psychiatric state, flooded his cell floor by blocking and flushing his toilet, as well as smashing his tablet computer and tossing his food tray.

38.     In response, the Sheriff's Emergency Response Team ("SERT") aggressively extracted Elijah from his solitary cell and relocated Elijah to a more secure solitary confinement cell, Cell 29. While in Cell 29, Elijah, stripped of his clothing and while naked in his cold cell, cried out to Sergeant Stone that he needed the assistance of mental health as he was poised to attempt suicide. Elijah also obsessively repeated his 'need' to immediately fill out a grievance in order to document the deliberately indifferent treatment that he received by Deputy Rapp.

39.     Responding to the prospect that the Deputy Rapp and Sergeant Stone would exaggerate his conduct such that he would be forced to undergo an excessively prolonged term in solitary confinement, i.e., "the box," Elijah's suicidal thoughts exponentially increased such that

it drove him to repeatedly and erratically carve on the walls and upon his body, "I cannot do this anymore." Having received absolutely no mental health intervention over the two hours since the initial encounter with Deputy Rapp, Elijah, after saying a prayer, strung up his jumpsuit and after forcefully tying its pant legs around his neck, sought to hang himself and end the impending torture that was in store for him.

40.     Having undertaken his hanging and on his way to dying, Elijah was suddenly jolted back into consciousness upon slaps to his face by Defendant Deputy Vedad Hujdur and verbal incentives by a responding nurse. Elijah miraculously came to and immediately upon returning, Defendant Deputies, Hujdur, Alton Apples, Thomas Fodaro, Vedad, and Deputy Rapp aggressively slammed Elijah's naked body face down onto the concrete floor and deployed a barrage of punches and kicks in malicious disregard of Elijah's semi-conscious post-suicide state.

41.     After the beating, the deputies left Elijah, still naked with blood flowing from his ear, lying on the floor for forty-five minutes despite Elijah begging for medical and mental health assistance. On account of the deputies' beating, Elijah sustained a ripped, left ear tunnel, perforated eardrum, a concussion, and severe contusions to his face, legs, and wrists.  The recorded audio of the beating documents deputies cursing, "shit shit fuck fuck" when they observed blood profusely protruding from Elijah's ear. One deputy is heard to say "cover his ear" referring to the blood and the ensuing regulation hand held video recording.

42.     After the beating, Elijah was transported by Deputies Apples, Hujdur, and Fodaro to the mental health unit 5C and aggressively tossed onto a cell's floor still naked and traumatized where he remained for an additional fifteen minutes. In total, Elijah was left to lie

naked on the concrete floor with severe head and ear injuries for one hour without receiving any medical or mental health treatment.

43.    Thereafter, in response to his suicide attempt, Elijah was restricted to his cell for two weeks for twenty-four hours at a time with no recreation or leave despite the prohibition of against placing him in such solitary confined conditions on account of being designated as an inmate with 'serious mental illness.'

44.    On account of the unremitting solitary confinement conditions he was forced to endure, Elijah was swiftly descending into a manic state wherein he would attempt self-harm by banging his head against the concrete walls, scratching himself, rocking to and fro, muttering to himself and yelling at the top of his lungs. In response, and in exacerbating Elijah's harm, a deputy sentry was posted at his cell door for twenty four hours scornfully scrutinizing him which amplified Elijah's suicidal ideation.

***Imposition of a 90-day term of solitary confinement***

45.    Thereafter, in an attempt to cover-up for their abhorrently excessive force, Defendants and supporting supervisors, including Defendant Hearing Officer Deputy Michael Kolakowski, attempted to charge Elijah with the disciplinary offense of assaulting a deputy when no such conduct took place preceding the beating as Elijah, seconds before, had been resuscitated from his attempt to hang himself. Kolakowski sought to have Elijah plead to the assault by switching the DR/IR codes after Elijah accepted responsibility for conduct that preceded his suicide attempt, i.e., flooding his cell floor (hygiene risk) and breaking his computer tablet (destruction of county property). Nevertheless, Elijah was sentenced to a 90-day solitary confinement period which was a sentence commensurate with a guilty plea of assault rather than the infractions that he in fact plead guilty to which omitted the assault charge.

46.     Regardless, as the Hearing Officer in charge of imposing sentences, including terms of solitary confinement, Deputy Kolakowski knew or should have known that an inmate with Elijah's designation, i.e., 'serious mental illness,' was prohibited under New York's HALT act from undergoing any term of solitary confinement, let alone an excessively consecutive term of 90 days.

47.     On or about February 14, 2024, Elijah appealed his disciplinary charge and sentence but his appeal was subsequently ignored on account of its tardiness despite Elijah's inability to file a timely appeal given his placement on suicide watch after his February 9, 2024 suicide attempt and subsequent beating.

48.     In experiencing a severely unrelenting psychotic break catalyzed by the 24 hour suicide watch solitary confinement, Elijah, on or about February 19, 2024, in a last gasp effort to call attention to his plight of having to endure the torturously extended and statutorily infirm term of solitary confinement, Elijah engaged the tamper switch of the overhead sprinkler system as a cry for help with the hope that he would be brought before a judge where he could then communicate the illegality of the terms of his solitary confinement as a 'seriously mentally ill' detainee.

***Elijah seeks judicial and administrative redress of grievances***

49.     Soon thereafter Elijah drafted a legal complaint which erroneously relied upon a writ of habeas corpus seeking damages for the harm he incurred at the hands of the Defendant deputies who mercilessly assaulted him on February 9, 2024 solely on account of his serious mental illness and attempt to commit suicide.

50.     Elijah sought to file this complaint with the District Court of the Western District of New York which, given his solitary confined conditions, was forced to rely upon the Mental

Health Unit 5C unit deputies, including Defendants' Senior Deputy in charge, Scott McDonald, and Deputies Joshua Cruz and Peter Forsythe for submitting his letters to the mailroom.

51.     In acknowledging that Elijah was attempting to file a complaint with the District Court, Senior Deputy McDonald questioned its contents and threatened that the complaint might disappear before its mailing. The same is true with respect to Deputies Cruz and Forsythe who in learning that Elijah was seeking court oversight, heckled and harassed him and thereafter, along with McDonald, consistently refused to either collect or deliver his mail.

52.     In attempting to assert his right to be free from excessive solitary confinement as a seriously disabled inmate, as well as to ensure receipt of the required 'out-of-cell' and recreation time as required by New York's HALT Act, Elijah sought to elicit the institution's grievance procedure by attempting to file grievances with Defendant Deputies Cruz, Forsythe, and Senior Deputy McDonald who repeatedly rebuffed Elijah's attempts to employ the grievance process.

53.     Such refusals were acts of retaliation in response to Elijah's desire to call attention to not only the deputies' refusal to accept and submit his grievances, but for their part in violating his rights as a disabled inmate by failing to comply with federal, state, and institution rules and regulations pertaining to the administering of solitary confinement.

54.     As the Justice Center was without an effective complaint mechanism for disabled inmates like Elijah to report discrimination or to request accommodations other than having to rely on the otherwise intentionally obstructed and thereby effectively non-existent grievance system.

***Defendants persistent refusal to accept and file Elijah's grievances***

55.     The Deputies, including Senior Deputy McDonald, Cruz, and Forsythe's persistent refusal to provide Elijah and other inmates timely grievance forms, i.e., within five days of the alleged infraction or incident,[1] often resulted in the deputies refusal to thereafter accept the completed grievances upon the rationale that the grievances were untimely.

56.     Thus, in his grievances, Elijah complained that the Deputies, including McDonald, Cruz, and Forsythe were intentionally blocking his and other inmate's complaints as to the abhorrent conditions in the 5C unit from reaching the Center's supervisory staff, the Onondaga County Sheriff and/or the Commissioner of Corrections in Albany.

57.     In particular, Elijah informed supervisory staff, including Sergeants Stone and Allen, as well as Lieutenant Benjamin Okun that he was obstructed from filing a timely complaint with respect to the February 9, 2024 post suicide beating he received. In response, Lieutenant Okun informed Elijah that his suicide attempt caused him an added workload and that he was not going to provide Elijah with any additional opportunity to grieve and cause further 'trouble.'[2]

58.     Additionally, on or about March 18, 2024, after perceiving that the deputy staff were attempting to provide him with grievance forms that were absent a tracking number and hence, forms that could easily be tossed away and unable to be tracked, Elijah sought an

---

[1] The following grievance protocol existed during the operative time frame of February- June 2024. An inmate informs the unit Deputy of a problem or concern to which the Deputy is charged to attend to. If unable to provide the inmate relief, an inmate can request to file a grievance to which the Sergeant has within 24 hours to provide the inmate with a grievance form. Upon receipt, the Sergeant dispatches the grievance to the grievance coordinator to determine whether the grievance should be sustained, denied, or to be further investigated. Were an inmate dissatisfied with the Coordinator's decision, the inmate can request further review such that the Center's c Chief, here, Chief Drapikowski was charged with review. Were Chief Drapikowski to deny the inmates grievance, the grievance can be forwarded to the NYS Commissioner for Corrections in Albany. The above process however must commence with a legitimate grievance form with a designated tracking number. As such, the Deputy Sergeants sought to obstruct inmate grievances by providing tracking absent forms which were systematically discarded upon receipt.

[2] As the Lieutenant overseeing the SERT crew including Defendant Deputies Apples, Hujdur, and Fodaro, Lieutenant Okun had consistently 'doctored' and falsified complaints levied by inmates against his SERT members with the intention of shielding them from disciplinary action and/or civil liability.

'official' grievance form such that he could apprise the supervisory staff of how the deputies were obstructing prisoner complaints. Sergeant Ashley Keeney as well as the 5C Deputies, perpetuated such unlawful practice by providing Elijah with a tracking-absent grievance form with her signature and a large smiley face taking up the entire right corner of the form which unequivocally communicated that she had absolutely no intention of filing his grievance.

59.     Other Deputies, including McDonald, Cruz, and Forsythe also refused to provide Elijah with a tracking number grievance form by pretending not to acknowledge Elijah's request, and or providing him a false promise to return without the intention of doing so.[3]

60.     With perseverance, Elijah was ultimately able to procure a proper grievance form in which he set out the above allegations of the denial of his right to grieve, as well the details of the February 9, 2024 post suicidal beating he incurred.

61.     Within this same March 18, 2024 complaint, Elijah requested that the Justice Center handbook be amended to accurately reflect the changes under the N.Y. Correction law Section 137 (HALT Act) which expressly prohibited the imposition of solitary confinement for mentally disabled inmates, as well as set forth the minimum amount of time an inmate can be subjected to solitary confinement. Such correction would enable both the Deputies and inmates, particularly those who were housed in the 5C-mental health unit to fully understand their afforded rights.[4]

---

[3] In order to ensure that some oversight authority was apprised of the Deputies' policy and practice of refusing to accept and file Elijah's grievances, Elijah was forced to surreptitiously send his a grievance, dated, March 18, 2024, to his mother by way of a fellow inmate's mail code which Elijah's mom then dispatched to the Citizens Policy and Complaint Review Council in Albany, NY who then, upon receipt, forwarded Elijah's grievance back to the Justice Center for investigation.

[4] In the March 18, 2024 grievance, Elijah named mentally disabled inmates including Hunter, Brown, Nyquist Allen, Luis Lopez, and Odell Stanley who had been locked up in solitary confinement for unlawfully prolonged periods despite their mental disability.

62.     Elijah additionally dispatched a separate complaint to Defendant, Chief Custody Deputy John Drapikowski, who effectively served as the 'warden' of Justice Center, informing him of the illegal solitary conditions, as well as the unconscionable and discriminatory practices occurring within the mental health unit, 5C.

***Elijah subjected to consecutive term of 131 days of solitary confinement***

63.     Throughout the entirety of his term of detention at the Justice Center (January 20, 2024 to June 18, 2024), Elijah was held in unlawful solitary conditions for a consecutive one hundred and thirty one (131) days.

64.     Primarily, Elijah was sentenced to a 91 day term of solitary confinement after his February 9, 2024 suicide attempt for conduct constituting: (1) flooding his toilet(hygiene risk); (2) breaking a computer tablet (misuse of county equipment); and (3) assault (which was an unsubstantiated and fabricated charge that Elijah had not plead to but whose sole existence was to substantiate the beating he received at the hands of Defendants' Apples, Fodaro, Hujjdur, and Rapp).

65.     Following his 90-day term of solitary confinement, Elijah was sentenced to an additional 105 days of solitary confinement on or about April 30, 2024 for the petty offenses of disorderly conduct and harassment stemming from an April 19, 2024 incident where Elijah was assaulted by a fellow inmate and thereafter by Defendant Sergeant Saddock [5].  Considering that Elijah's 'serious mental illness' designated status precluded him from serving any term of solitary confinement, the cumulative 195-day term was exceedingly excessive.[6]

---

[5] *See, infra* ¶¶*79-81.*
[6] Such exorbitant number of days was exceedingly disproportionate to the petty charges sustained thereby raising a reasonable inference that such solitary confinement was retaliatory in nature.  Despite the total number of days imposed equaled 196 days, Elijah's term of confinement came to a completion on June 18, 2024 thereby requiring him to only serve a total of 131 days of the imposed 196 days. Had his sentence continued, Elijah was facing the balance of 65 more days in solitary

### *Denial of meaningful review of confinement conditions*

66.     Despite being entitled to meaningful notice of the type of behavior changes that would have otherwise enabled Elijah permission to transfer into less restrictive confinement conditions, as well as to receive meaningful and timely periodic reviews to determine whether his behavior warranted less restrictive conditions, Defendants Drapikowski, Kolakowski and McDonald failed to provide Elijah with this required notice.

67.     In failing to (1) consider whether Elijah's behavior had changed over his 91 and 107 day sentences in order to determine whether he was still in fact a security and/or a suicide risk, or (2) conduct timely reviews that included providing Elijah with an opportunity to respond, participate, or provide additional information, Defendants' Drapikowski, Kolakowski and McDonald were affirmatively acting in violation of Elijah's due process rights.

68.     Nevertheless, during this 131 day period of solitary confinement which, based upon Elijah's "serious mental illness' status, no such period of solitary confinement should have been imposed,[7] Elijah was persistently precluded from receiving his seven continuous hours of out-of-cell time as required under the HALT act.[8]

### *Elijah's subjection to retaliatory adverse actions*

69.     In retaliation for Elijah's persistence in requesting his right to grieve the Deputies' persistent violations of his and other 5C disabled inmates rights, the 5C Deputies would

---

[7] NY Correct. Law § 137(6)(e) and (h).

[8] NY Correct. Law § 137(6)(h).

consistently threaten,[9] belittle, demean, and withhold out-of-cell' and recreation time[10] in response.

70.    In addition to the 5C Deputies, Hearing Officer Deputy Kolakowski and Chief Drapikowski also partook in retaliatory conduct by denying Elijah any and all privileges to communicate with his family, either by phone or video which resulted in a complete communication blackout given that his family lived a far distance from Syracuse and thus, were unable to make in- person visits.

71.    When Elijah's phone privileges were limitedly reinstated and while requesting his family to contact the N.Y.S Division of Human Rights and the N.Y. Commissioner of Corrections in order to submit a complaint regarding the unlawful and discriminatory treatment that Elijah and other mentally disabled inmates were incurring at the Justice Center, Elijah's phone call was abruptly cut off and Elijah was swiftly ushered to his cell.

***The discriminatory and cruel and unusual conditions on 5C Mental Health Unit***

72.    As the 5C Unit housed the Justice Center's mentally disabled detainees, Elijah witnessed and observed the Deputies assigned to the Unit, including Senior Deputy McDonald and Deputies Cruz and Forsythe, who, as assigned to the Mental Health Unit were well apprised of Elijah's, as well as the other inmates assigned to the unit's mental health and disability conditions, torturously inflicted repeated harms on the bipolar and schizophrenic detainees, all of

---

[9] Further emboldened in their intention to retaliate, Deputies' Cruz and Forsythe not only persisted in denying Elijah with his minimum required 'out-of-cell' time, but actively sought out opportunities to instigate Elijah to physically strike at them such that they could forcefully respond in kind and impose further disciplinary punishment.

[10] When provided recreation, Elijah was forced to remain trapped in a cage with the only access to the outside being a minimal window slider. Other times, despite freezing cold temperatures, the Deputies purposefully left the recreation windows open knowing that Elijah's minimally clad body, on account that his clothing had being confiscated and that their replacements as provided by his family were 'missing,' would suffer shivering coldness on account.

whom, including Elijah, were kept in unlawfully prolonged solitary confined conditions despite such practice's express prohibition under the HALT act.

73.     Elijah persistently brought to Unit 5C's Senior Staff Deputy McDonald's attention that he, as the Senior Deputy must ensure that he, and the other more junior Deputies, comply with the HALT Act's rules and regulations that limited solitary confinement to three consecutive days or six days in any 30-day period(not longer than 15 consecutive days, or more than 20 days in a 60-day period) and at a minimum, seven hours per day of out-of-cell 'recreation' time. NY Corrections § 137(6)(i)(ii); § 137(6)(h).

74.     Senior Deputy McDonald consistently refused to acknowledge Elijah's requests even when Elijah was able to provide McDonald with the black letter rules and regulations that he obtained from the Center's law library.

75.     Elijah informed Senior Deputy McDonald that the 5C Deputies, Forsythe and Cruz had been systematically violating the HALT acts minimum time periods for release from solitary confinement by subjecting him to excessive periods of lockdown as a retaliatory measure for Elijah's grievances that informed their supervisory staff of their violations. Deputies Forsythe and Cruz additionally withheld providing the mandated out-of-cell time a means of selfishly avoiding having to undertake more engaged supervisory duties. Thus, Forsythe and Cruz would order lockdown for the entire unit on account of any resident's slightest infraction and/or if there existed a football or basketball game on television that they wished to view.

76.     As such, the staff assigned to the 5C Mental Health Unit including, Senior Staff Deputy McDonald, Senior Staff Deputy John Hilton, Senior Staff Deputy Sherwood, Deputy Cruz, Deputy Forsythe, Senior Staff Deputy N. Biggs, Deputy Bo Watson, and Deputy J Faber had all either affirmatively engaged in or were well apprised of the abhorrently abusive

treatment, including excessive terms of solitary confinemnt that Elijah and other mentally disabled detainees were subjected to but despite such knowledge, deliberately disregarded, enabled and/or ratified such conduct perceiving it as just, "another day at the office."

77.     Deputies Forsythe and Cruz's conduct was particularly egregious wherein they perpetually taunted Elijah and the other seriously mentally ill inmates by encouraging them, as "retards," to 'kill themselves' when they expressed suicidal ideations whose frequent occurrence was exponentially exacerbated on account of the Deputies unlawful and selfishly imposed prolonged solitary confinements.[11]

78.     Additionally, Defendant Deputies Hujdur, Apples and Fodaro,[12] the three deputies who maliciously beat Elijah for attempting to commit suicide on or about February 2, 2024, as well as Sergeant Saddock were infamous in the unit as being particularly sadistic in their beatings of disabled and general detainees where, upon grievances, letters, and lawsuits, such practices were also well known to supervisory staff at Onondaga Corrections, including Chief John S Drapikowski, Deputy Chief Martin Ferguson, SERT Lieutenant O'Kun, Captain Gillian, Captain Moore, Internal Affairs Captain Bloomer, Internal Affairs Sergeant Stark, as well as by the Onondaga County Sheriff, Tobias Shelly, the County of Onondaga[13] and State Commissioner of Corrections, Daniel F. Martuscello III.

---

[11] For example, one such seriously disabled inmate, Shawn Keasre who, having been pushed to his limit under the Unit's consistent failure to provide relief from solitary conditions as required under the HALT act, took heed of the Deputies suggestion of suicide by attempting such, and in response, Deputy Ackerman entered Kearse's cell and maliciously beat and pepper sprayed him, leaving him thereafter to wallow in the spray's burning sensation until shift change some several hours later.

[12] Defendants Hujdur, Fodaro, Apples, Saddock, Deputy Sandrson, and Lieutenant Okun were members of the SERT crew who were notoriously well known as the 'Broom Squad' as they were called upon "to sweep up the messes" occurring in the mental health unit 5C and throughout the other units throughout the institution.

[13] Defendant County was well apprised that members of the Justice Center's '*Broom Squad*,' as well as additional County Deputies employed at the Justice Center were consistently deploying excessive use of force with impunity when undertaking their duties at the Center. As such, the following Northern District of New York cases have and/or continue to be litigated against the County on account of the constitutionally infirm conduct of Defendants' Apples,

***Elijah subjected to excessive force on April 19, 2024 resulting in a 105-day sentence to solitary confinement***

79.     In or about April 19, 2024, while outside of his cell, an inmate who had repeatedly assaulted other detainees on at least three occasions, unprovokedly punched Elijah in his face several times and slammed him with a chair while deputies stood by and watched. Although Elijah did not fight back, he was targeted by the deputy code responders as the aggressor and as such, was slammed to the ground and taken to Cell. 54. Despite being the victim of the attack, Elijah received a disciplinary charge.

80.     In response and incensed, Elijah began vociferously decrying the injustice that he had been incurring to which Defendant Sgt. Dustin Saddock threatened to 'pop,' i.e., enter, Elijah's cell and beat him down. As Elijah persisted, Sgt. Saddock immediately 'popped' the cell door and after throwing a sheet over Elijah's head feigning the appearance of a suicide attempt, initiated a fabricated code blue suicide attempt.

81.     Immediately thereafter and before other deputies had arrived, Saddock delivered a closed fist strike to Elijah's face and slammed him onto the ground. While on the ground, Saddock forcefully deployed his knee on Elijah's neck while delivering closed fist strikes to Elijah's body resulting in concussive head injuries and contusions to his face, neck and torso.

82.     Upon being transported to a lower tier cell after Sgt. Saddock's fabricated code blue and malicious attack, Elijah was escorted by Defendant Deputies Hujdur and Fodaro, who

---

Hujdur, Fodaro, Saddock, Drapikowski, and other County Deputies and Supervisory staff. *See, for e.g., Moore v. County of Onondaga, et al.*, 5:25-cv-00254; *Ozell Stanley v. Onondaga County, et al.*, 9:24-cv-01434; *Allen v. Onondaga County Sheriff's Office, et al.*, 9:24-cv-00332; *Barzee v. Shelley, et al.*, 9:24-cv-01544; *Miller-Harris v. County of Onondaga, et al.*, 9:22-cv-01363; *MHJ v. Shelley, et al.*, 9:23-cv-00362; *Reynolds v. County of Onondaga,* et al., 5:22-cv-01165.

had been the same deputies that deployed excessive force on Elijah on February 9, 2024, immediately upon resuscitation from his attempted hanging.

83.     As Elijah was weak in his knees and legs and on account of the back-to-back assaults that he incurred by both the unbridled inmate and Sgt. Saddock, Elijah had difficulties walking which Hujdur and Fodaro relied upon to intentionally drop Elijah face first on the top tier stair case. As Elijah was failing, Hujdur delivered a closed fist punch to Elijah's face. Such attack was in blatant retaliation for Elijah's complaint and grievance pertaining to the February 9, 2024 incident. Elijah was then transferred to a suicide cell on the lower tier and was held there for approximately two days, having to endure excruciating pain to his mouth as Saddock's punches resulted in the cracking of his two back molars and concussion syndrome.[14]

84.     Thereafter, in further retaliation for his speaking out as to the Deputies conduct on 5C, Elijah was sentenced to excessive 'solitary' time (105 days) despite him being the victim (and not the aggressor) of a well acknowledged violent inmate and the recipient of excessive force at the hands (closed fists) of Sergeant Saddock and Deputy Hujdur.

***Impacts of excessive solitary confinement on Elijah's mental health***

85.     Given Elijah's pre-existing psychiatric medical condition with diagnoses of extreme bipolar disorder, severe depression, severe anxiety disorder, and suicidal ideation, the excessive solitary lockdown exceedingly debilitated Elijah's state of mind forcing him into psychotic and suicidal states exhibited by perpetual self- harm and suicide attempts by banging his head against his cell's concrete walls, cutting himself, compulsive rocking back and forth,

---

[14] The cell that Elijah was transferred to had an unbearably fetid odor caused by feces under the cell's sink. Such smell sickened the already infirm Elijah on account of the beatings he had previously sustained by the inmate on 5C and thereafter by Sgt. Saddock and Deputy Hujdur. Given both the throbbing pain from the prior day's injuries and his inability to ingest his meals on account of the horrific smell, the conditions in Elijah's solitary cell caused him severe psychological anguish.

perpetual yelling out of cell's window, and expressing panic stricken delusions and paranoia.

Such expressions were only exacerbated by the twenty- four hour surveillance he was subjected

to by a sentry deputy posted at his door repeatedly scouring and scorning him merely on account

of Elijah's serious mental illness and his inability to endure such exacting solitary conditions.

86.     As such, during his 131 days in solitary confinement, Elijah made approximately

eight to ten attempts at suicidal self-harm which necessitated a considerable number of daily

mental health visits and an unsafe increase in his psychotropic medications.

***Elijah's complaint to Defendant County Sheriff Tobias Shelly.***

87.     In or about March 2024, Elijah drafted a complaint to Tobias Shelly, the Sheriff

of the Onondaga Sheriff's Office, and final policymaker for Onondaga County's corrections

policies and practice, requesting his assistance in having the Justice Center comply with New

York State regulations under the HALT act that otherwise limits the maximum lockup period for

detainees in solitary confinement.[15]

88.     This wasn't the first time that the Onondaga Sheriff and/or the County of

Onondaga was apprised that the Justice Center and other DOCCS (Department of Corrections

and Community Supervision) detention centers under its jurisdiction were systematically

violating their requirements under the HALT Act given their constructive knowledge of the

holdings in *Fuquan F. v. Annucci*, State Supreme Court, No. 902997-23, (Albany, June 20,

2024), where the Court determined the existence of systemic violations of the HALT Act and

*Maurice Anthony v. NYS Department of Corrections and Community Supervision*, State Supreme

---

[15] Some five months after Elijah dispatched a complaint to Onondaga County Sheriff Tobias Shelly and two months after Elijah was released from the Justice Center, Sheriff Shelly, on or about August 8, 2024, rendered his determination of Elijah's complaints by sustaining the allegations that that Elijah was repeatedly denied the HALT act's requirement that he be provided a 7-hour recreation period when being housed solitary confinement.

Court No. 512871/2024 (Kings County, May 7, 2024) where a class of mentally disabled inmates are seeking injunctive and declaratory relief ordering state wide correctional facilities, including the Justice Center, to comply with the express protections under the HALT act for people with disabilities that prohibits them from sustaining *any* periods of solitary confinement.

89. The County Sheriff and County were similarly on notice as to its unlawful use of solitary confinement when it settled a class action suit in the Northern District of New York, *VW v. Conway*, 9:16-cv-01150 (9/21/2016) wherein prisons within its jurisdiction were utilizing solitary confinement as an unlawful means of detaining a prison population as vulnerable and susceptible to harm as disabled inmates, i.e., juveniles and young adults.

***Elijah's complaint to NYS Commissioner of Corrections***

90. In or about May 9 2024, Elijah reached out to the State Commissioner of Corrections in Albany and pleaded with him to come to his aid on account of being a mentally ill detainee who was being retaliated against for filing grievances that called attention to the discriminatory treatment that was being perpetrated against him and the other mentally disabled detainees at the Justice Center's Mental Health Unit 5C. Elijah communicated to the Commissioner that he and other disabled inmates were being subjected to unlawfully long solitary times with minimal, and statutorily infirm out-of-cell periods in excess of twenty four hours.

91. Elijah communicated that in contrast to those in general population who were not designated as disabled inmates and who were not being locked down under the same unlawfully extended time durations (and consistently prohibited their statutory out-of-cell time) as were the

disabled inmates in 5C,[16] the inmates in 5C were psychologically unfit to endure anywhere close to the excessive periods that they were torturously subjected to.

92.     Elijah also apprised the Commissioner of additional discriminatory conduct directed at him and other disabled inmates by withholding the distribution of institution issued computer tablets under the pre-textual rationale that psychologically disabled inmates were somehow uniformly unfit to utilize them.

93.     Lastly, Elijah implored the Commissioner to assist in alleviating his individual situation of being in solitary for a total period of 131 days without interruption as he was in psychological distress and that others in the mental health unit were additionally being torturously abused such that institutional remedies were imminently required.

94.     In response and upon information and belief, the Commissioner promptly communicated with Chief Drapikowski to place Elijah into general population.

***Elijah is subjected to more severe solitary confinement conditions upon Chief Drapikowski's retaliatory order.***

95.     On or about May 15, 2024 Chief Drapikowski disingenuously disregarded the Commissioner's directive by maliciously informing Elijah that he was being transferred to general population when in fact, he had already determined to place him in the more oppressive

---

[16] Unlike the general population, the POD Deputies, including Senior Staff Deputy McDonald, Senior Staff Deputy John Hilton, Senior Staff Deputy Sherwood, Staff Deputy Cruz, Deputy Forsythe, Senior Staff Deputy N. Biggs, and Deputy J Faber utilized extended and unlawful solitary confinement periods, not as a means of instilling compliance with prison regulations or to mitigate the impact of violent and dangerous inmates, but rather as a convenient means to exponentially lessen their workload and need to expend energies in supervising the mentally disabled inmates when the entirety of floor was locked-in for hours in excess of twenty two hours. Thus, the Deputies undertook such blatant violations of the HALT act, prison regulations and the American with Disabilities Act solely on account of the mental disabilities that Elijah and his Unit residents expressed. Had the Deputies attempted to utilize solitary confinement as a means of making their shifts easier on the general population floors, they would have never been able to persist with such conduct.

5B solitary unit as an intentional act of retaliation for Elijah having contacted the State Commissioner of Corrections.

96. The solitary conditions on 5B were much more severe as the cell Elijah was housed was a padded, sound-proof room the state of which exponentially exacerbated Elijah's already debilitated mental state. Such confined conditions took on emergency proportions as the periodic mental health visits that he received at the mental health unit, 5C were nonexistent while locked away in the padded cell on 5B. Elijah drafted many grievances and letters to Chief Drapikowski imploring him to relieve him from the dire solitary conditions that he was torturously having to endure on 5B and to return him to 5C.

97. Although Elijah did in fact obtain recreational time every seven hours while on 5B, Defendant deputies purposefully offered the recreational time at inopportune times forcing Elijah to choose between showering or recreation or eating meals or recreation.

***Elijah submits follow-up complaints to NYS Commissioner of Corrections***

98. Again, on or about May 24, 204, Elijah dispatched a second letter to the Commissioner of Corrections apprising him that he was still being subjected to solitary conditions on a unit, 5B that was unable and unwilling to provide him with his mental health needs. Elijah implored Justice staff including, Chief Drapikowski, Sergeants' Allen and Sarno, as well as Lieutenant Woods that he was in dire need of being relocated back to the mental health unit as his psychological state was spiraling out of control. Elijah was informed that were he to be relocated to the mental health unit, his ability to receive the legally required seven hour 'out-of-cell' recreation outside of the solitary conditions would not be accommodated.

99. Elijah informed the Commissioner that Defendants and other Deputies undertook their discriminatory abusive conduct with impunity knowing that, as Defendant Hujdur expressed, "the County will cough up some money and I'll still be at work tomorrow. We have

such a great union." Elijah explained that Deputies like Hujdur, who were notorious for engaging in excessive force had not received any disciplinary reprimand for his conduct, including his assaults on Elijah on February 9, 2024 and on April 19, 2024.

100.    Elijah again implored the Commissioner to effect changes to ensure that mentally disabled inmates like himself will no longer be subjected to systemic abuse and to remediate the Justice Center's complete disregard of the HALT act by locking away already mentally fragile inmates for excessive hours and subjecting them to ridicule and verbal and physical abuse. Elijah stressed that his advocacy for himself and others who were unable to advocate for themselves on 5C had resulted in his incurring continual and relentless retaliation which he was no longer strong enough to endure.

***Elijah completes his term of incarceration and is released from the Justice Center.***

101.    Finally, in or about June 18, 2024, Elijah had finished his year long sentence for probation violation and was released from his unimaginable decent into the hellish conditions under which Onondaga County subjugated its mentally ill detainees. Prior to his release, Elijah drafted a letter to the NYS Office of Mental Health informing them of the conditions that he had endured and the torturous treatment that mentally disabled detainees were subjected to at the Justice Center with a hope that the Office will investigate and implement reform such that others like himself will be spared the harm that he and his fellow detainees on the 5C Unit were forced to endure.

***Elijah endures the irreparable harms he incurred upon serving 131 days at the Justice Center.***

102.    Upon his release and persisting to the present time, Elijah has suffered and continues to suffer lasting and permanent physical damage to his neurological functions including recurring severe and chronic headaches, memory lapses, balance and equilibrium dysfunction, nerve damage, dizziness, inner ear abnormalities, hearing loss.

103.    Similarly, Elijah's psychiatric condition was irrevocably harmed on account of Defendants' heinous and barbaric conduct wherein his affliction with post traumatic stress disorder and residual nightmares have exponentially increased such that his flashbacks of (1) the beatings he sustained at the hands of Apples, Hujdur, Fodaro, and Saddock, (2) the psychotic states experienced during his terms of excessive solitary confinement, (3) the suicide attempts and acts of self-harm undertaken during the 131 days relegated to solitary confinement and (4) the anxiety fueled rage over the powerlessness that he was intentionally made to feel by the taunting and abusive Defendant deputies conduct, continually get triggered as he interacts with his family, children, government personnel, and engages in every day commercial interactions.

103.    The trauma Elijah incurred from his 131 days at the Justice Center has required a significant dosage increase in his psychotropic and nightmare medications in order to keep his violent and rageful self loathing and shame at bay such that it's all that he can do to keep from intentionally crashing his mother's car and being in the same room with his eight year-old son.

104.    As the harm that Elijah incurred at the hands of Defendants is irreparable, he nevertheless seeks redress and justice such that Defendants can reckon with the full import of their disregard for Elijah's humanity, dignity, and inherent worth as a human being.

**FIRST CAUSE OF ACTION**
**Violation Of Civil Rights Laws**
**42 U.S.C. §1983**
**Eighth Amendment**
**Excessive Force**
**(Against Defendant Deputies**
**Apples, Hujdur, Fodaro, Saddock)**

105.    Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

106.     As an inmate, Elijah was afforded Eighth Amendment protection against the use of excessive force.

107.     Primarily, when Defendants' Apples, Hujdur, and Fodaro, acting under color of law, unhesitatingly subjected Elijah to a maliciously intended beating seconds after Elijah was resuscitated from his February 9, 2024 attempt to hang himself with a bedsheet in his solitary confined cell, the reprehensibleness and repugnancy of such attack most unequivocally trammeled upon 'contemporary standards of decency' and is palpably 'repugnant to the conscience of mankind.'

108.     After Elijah's savage beating, he was left lying naked on the concrete floor with a profusely bleeding ripped and ruptured left ear tunnel, a punctured left ear drum, blunt force trauma contusions to his jaw, cheeks, left leg and left shoulder. Given Defendant Deputies use of force was solely in response to a seconds earlier suicide attempt, the intent of the Deputies use of force can most reasonably be construed as 'maliciously and sadistically [meant] to cause harm' rather than 'a good-faith effort to maintain or restore discipline.'

109.     Secondly, on or about April 19, 2024, Hudjur and Fodaro, acting under color of law, engaged in a 'malicous and sadistic attack' when they both dropped Elijah face first down on the staircase while Hudjur delivered a blow to Elijah's face on his way down. Given that moments before Elijah sustained repeated blows to his head, including the use of chair and thus was physically injured, the deputies were absent of any 'a good faith' rationale for discipline' as Elijah was merely attempting to traverse the staircase with a head injury as both Hujdur and Fodaro held a firm grasp while assisting him down.

110.     Thirdly, when Defendant Deputy Saddock, on or about April 19, 2024, responded to Elijah's exercise of his right to grieve the conditions that he and other disabled inmates were

experiencing (and without violating any institutional regulation or disobeying an order) with a unprovoked and unjustified beating that included (a) closed fist punches to his face and torso resulting in two broken molars, (b) a head first body slam onto the concrete floor, and (c) the driving of his knee onto Elijah's neck, such use of force unequivocally rose to the level of a patent disregard of 'contemporary standards of decency' and was palpably 'repugnant to the conscience of mankind.'

111.    Similarly, Saddock's malicious and sadistic intention to cause Elijah harm was underscored by Saddock's pre-use-of-force fabrication of a suicide attempt by tossing a bed linen over Elijah's head feigning an attempted hanging and initiating a code blue before subjecting him to the above excessive force.

112.    Fourthly, upon being transported to a lower tier cell after Sgt. Saddock's fabricated code blue and malicious attack, Elijah was escorted by Defendant Deputies Hujdur and Fodaro who dropped Elijah face first on the top tier stair case and upon falling, Hujdur delivered a closed fist punch to Elijah's face. Such attack was in blatant retaliation for Elijah's complaint and grievance pertaining to the February 9, 2024 incident.

113.    As a direct and proximate result of the actions of Defendant Deputies Apples, Hujdur, Fodaro, and Saddock, Elijah suffered and continues to suffer: lasting and permanent damage to his neurological functions including concussion syndrome, severe and chronic headaches, memory lapses, balance and equilibrium dysfunction, hearing loss, nerve damage, dizziness, inner ear abnormalities, mental and emotional distress, hallucinations, anxiety, nervousness, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, concentration deficits, migraines, insomnia, memory diminishment, illusions, social withdrawal, confusion, humiliation, fear, migraines,

insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight.

114.    Elijah is further informed and believe that the acts and/or omissions of Defendants' Apples, Hujdur, Fodaro, and Saddock were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

### SECOND CAUSE OF ACTION
**Violation Of Civil Rights Laws**
**42 U.S.C. §1983**
**Eighth Amendment**
**Unlawful Confinement Conditions**
**Contravening Standards of Decency**
**(Against Defendant Chief Drapikowski, Hearing Officer Kolakowski,**
**Deputies McDonald, Cruz, and Forsythe)**

115.    Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

116.    As designated as a seriously disabled inmate on account of suffering from diagnoses' of extreme bipolar disorder, severe depression, severe anxiety disorder, and suicidal ideation, Elijah's psychiatric state rendered him extremely susceptible to an 'unreasonable risk of serious damage to his health' were he to be subjected to even minimal periods of isolated solitary confinement, let alone the consecutive term of 131 days that he was torturously subjected to.

117.    While it is well established that the cumulative effect of prolonged solitary confinement constitutes a serious deprivation of basic human needs that contributes to such psychological harms as hallucinations, anxiety, nervousness, panic attacks, irrational anger, rage, loss of impulse control, paranoia, severe and chronic depression, claustrophobia, concentration deficits, memory diminishment, illusions, social withdrawal, confusion, depersonalization, and

physical harms as migraines, insomnia. appetite and weight loss, heart palpitations, back and joint pain, hyperactivity, tremulousness, and deterioration of eyesight, the impacts of such upon inmates with mental illness, like Elijah is exponentially increased.

118.    By perpetuating the policies, practices, derogations, and intentional disregard of law and regulations pertaining to the confinement of inmates like Elijah whom Defendants' Drapikowski, Kolakowski, McDonald, Cruz, and Forsyth were well apprised, when undertaking their duties under color of law, that Elijah was categorized as a having a 'serious mental illness,'

119.    Defendants deliberately caused Elijah to suffer severe and irreparable harm by knowingly disregarding the substantial risks to Elijah's psychiatric and physical health upon subjecting him to an unlawfully excessive term of solitary confinement. As such, Defendants Drapikowski, Kolakowski, McDonald, Cruz, and Forsythe knew of, and disregarded, the risk that the imposition and perpetuation of an excessive and unlawful term of solitary confinement would have on Elijah's mental health, human dignity and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

120.    Given the substantial and well documented acknowledgement of the deleterious effects of solitary confinement on disabled inmates, it should have been obvious to Defendants Drapikowski, Kolakowski, McDonald, Cruz, and Forsyth that subjecting Elijah to an excessive term of solitary confinement without providing the minimum required out-of-cell time would pose him a substantial risk of significant psychological harm.

121.    Defendants' deliberate indifference is additionally underscored given the absence of any reasonable 'penological justification' for either the term lengths imposed and/or for perpetuating the confined conditions when it was reasonably certain that Elijah was no longer suicidal nor a behavioral threat to the staff or inmates on the 5C unit.

122.    Elijah has similarly satisfied the requirement of exhausting his administrative remedies under the the Prison Litigation Reform ("PLRA") where, as the underlying facts herein make plain that, Defendants' Drapikowski, McDonald, Cruz, and Forsyth intentionally and significantly frustrated Elijah's ability to timely file the required administrative grievances such that the grievance mechanism on the mental health unit 5C was effectively 'not functionally available' to Elijah and the other disabled inmates on 5C.

123.    Elijah had in fact succeeded in filing a grievance that duly apprised Chief Drapikowski, as well as Onondaga County Sheriff Tobias Shelly and the NYS Commissioner of Corrections as to the unlawful solitary confinement conditions that he, and the other disabled inmates were torturously being subjected to within the Justice Center's Mental Health Unit.

124.    To the extent that Defendants rely upon the PLRA as grounds for dismissing Elijah's Eighth Amendment conditions claim, the facts alleged herein reasonably substantiate that the grievance procedure that was otherwise administratively provided Elijah was effectively unavailable where Defendants' Drapikowski, McDonald, Cruz, and Forsythe, as well as other 'prison personnel and administrators' engaged in a policy and practice of 'thwarting" Elijah "from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'

125.    As a direct and proximate result of the actions of Defendant Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe, Elijah suffered and continues to suffer: mental and emotional distress, hallucinations, anxiety, nervousness, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, concentration deficits, migraines, insomnia, memory diminishment, illusions, social withdrawal, confusion, humiliation, fear, migraines, insomnia. heart palpitations, back and joint pain,

tremulousness, and deterioration of eyesight.

126. Elijah is further informed and believe that the acts and/or omissions of Defendants' Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

### THIRD CAUSE OF ACTION
**Violation of Civil Rights Laws**
**42 U.S.C. §1983**
**Fourteenth Amendment**
**Violations of Procedural Due Process**
**For Lack of Meaningful Review**
**(Against Defendant Chief Drapikowski,**
**Hearing Officer Deputy Michael Kolakowski**

127. Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

128. Defendants' Drapikowski and Kolakowski deprived Elijah of his protected liberty interest in avoiding long-term solitary confinement. The Defendants denied Elijah with both meaningful and timely periodic review of his solitary confinement in the 5C Metal Health Unit in violation of the Fourteenth Amendment.

129. Because an excessive term of solitary confinement comprising a term of 195 days constitutes a significant and uncommon hardship, Elijah was entitled to meaningful notice of the type of behavior changes that would have enabled him permission to transfer into less restrictive confinement conditions, as well as meaningful and timely periodic reviews to determine whether his behavior warranted such less restrictive conditions.

130. The Defendants denied Elijah any such notice or meaningful review by: (1)

failing to provide him with notice as to what remediative actions he could undertake in order to get released from solitary confinement; (2) predetermining that Elijah was to remain in solitary confinement for the entirety of his 195 sentenced term; (3) refusing to consider any positive changes with respect to Elijah's conduct and whether the grounds initially relied upon for sentencing Elijah to solitary confinement were still justified for continuing his confinement; and (4) failing to conduct timely reviews and upon review, refusing to apprise Elijah with their findings such that he was effectively precluded from responding, participating, or providing additional information to Defendants such that a meaningful review was undertaken.

131.    Thus, Defendants Drapikowski and McDonald failed to provide Elijah with notice as to either means of potentially easing the punishing solitary conditions in which he, and other disabled inmates were unlawfully and maliciously forced to endure.

132.    In failing to consider the existence of changes in Elijah's behavior over both his 91 day and 107 day sentence respectively in order to determine whether he was in fact a security or a suicide risk that would justify continuing the excessive solitary conditions under which he was detained, as well as failing to conduct timely reviews without providing him the opportunity to respond, participate, or provide additional information, Defendants Drapikowski, Senior Deputy McDonald, and Deputy Hearing Officer Michael Kolakowski were affirmatively acting in violation of Elijah's due process rights under the Fourteenth Amendment of the United States Constitution.

133.    As a direct and proximate result of the actions of Defendants' Drapikowski and Kolakowski, Elijah suffered and sustained damages for having to endure excessive and constitutional and statutory infirmed terms of solitary confinement that resulted in psychological damages that manifested and continue to manifest in: mental and emotional distress,

hallucinations, anxiety, nervousness, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, concentration deficits, migraines, insomnia, memory diminishment, illusions, social withdrawal, confusion, humiliation, fear, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight.

134.    Elijah is further informed and believe that the acts and/or omissions of Defendants' Drapikowski and Kolakowski were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

**FOURTH CAUSE OF ACTION**
**Violation Of Civil Rights Laws**
**42 U.S.C. §1983**
**First Amendment**
**Retaliation for Exercising Right to Grievance**
**(Against Defendant Chief Drapikowski,**
**Deputies McDonald, Cruz, and Forsythe)**

135.    Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

136.    Inmates clearly retain protections afforded by the First Amendment to be free from 'retaliation for pursuing their right to petition for the redress of grievances, including the filing of formal institutional grievances, judicial lawsuits, complaints to external supervisory and government representatives, and/or oral complaints to a correctional facilities supervisory personnel.

137.    Elijah exercised his protected right to grievance by filing a federal civil rights claim, as well as filing (and attempting to file) administrative grievances with Defendant Chief

Drapikowski and Deputies McDonald, Cruz, and Forsythe that gave voice to the constitutional and statutory violations that he, and the other disabled inmates housed in the Mental Health 5C unit, were incurring, including (1) subjection to excessive terms of solitary confinement as a 'seriously mentally ill' inmate under conditions that were in patent violation of the Eighth Amendment to the U.S. Constitution and New York's Correction Law 137, i.e., HALT act; (2) excessive force that he incurred at the hands of the "Broom Squad," i.e., Defendant Deputies' Apples, Hujdur, Fodaro, and Saddock; and (3) the policy and practice of Deputies and supervisory staff refusing to accept, file and process grievances as a concerted effort to silence Elijah, and other disabled inmates on 5C from complaining about the constitutional and statutory violations taking place within the unit. Elijah additionally exercised his right to grieve by communicating oral complaints to Defendants' McDonald, Cruz, and Forsythe who repeatedly ignored such grievances.

138.    In temporal proximity to Elijah's exercising his right to file a claim with the U.S. District court and administrative grievances with, among others, Senior Deputy in charge of the Mental Health Unit 5C, McDonald, the Justice Center's warden, Chief Custody Deputy Drapikowski, Onondaga Sheriff Tobias Shelly, NYS Commissioner of Corrections Daniel Martuscello III, NYS Department of Human Rights, and the Citizens Policy and Complaint Review Council, Elijah was subjected to Defendants' Drapikowski, McDonald, Cruz, and Forsythe's, and well as other OCSO deputies and supervisory staff's retaliatory 'adverse actions' including (1) outright refusal to accept, file, and process grievances that Elijah attempted to submit; (2) imposition of excessive terms of solitary confinement disproportionate to sustained administrative charges; (3) imposition of a term of solitary confinement after the NYS Commissioner of Corrections ordered Elijah to be placed in general population; (4) refusal to

provide statutorily mandated 'out-of-cell' time to Elijah and other seriously disabled inmates; (5) persistent threats of physical harm and instigation to elicit a deputy's use of force; (6) belittlement of Elijah's disabilities and taunting to commit suicide; (7) withholding and restricting access to recreation time; (8) withholding of telephone and mail access to family members; and (9) withholding of showering and commissary privileges. The above 'adverse actions' were sufficient for instilling a chilling effect upon Elijah's exercise of his First Amendment rights under the United States Constitution.

139.    As a direct and proximate result of the actions of Defendant Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe, Elijah suffered and sustained damages for having to endure constitutional and statutory harms that resulted in: mental and emotional distress, hallucinations, anxiety, nervousness, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, concentration deficits, migraines, insomnia, memory diminishment, illusions, social withdrawal, confusion, humiliation, fear, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight.

140.    Elijah is further informed and believe that the acts and/or omissions of Defendants' Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

**FIFTH CAUSE OF ACTION**
**Violation of Rights Afforded**
**Americans with Disabilities Act,**
**42 U.S.C. § 12132 and 28 C.F.R. § 35.152(b)(1)**
**(Against the County of Onondaga)**

141. Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

142. By its policies and practices of discriminating against prisoners with disabilities, Defendant County of Onondaga violates the Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12132 and 28 C.F.R. § 35.152(b)(1).

143. Defendant City of Onondaga is a public entity as defined under 42 U.S.C. § 12131(1)(A).

144. Plaintiff Elijah Vreeland has psychiatric disabilities and thus, is a qualified individual with disabilities. Elijah has a well established and recorded impairment that substantially limits one or more of his major life activities. Inmates with psychiatric and mental disabilities housed in correctional facilities meet the statutory eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant Onondaga County through its sub-agency, the Onondaga County Sheriff's Office. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

145. Defendant County violates the ADA by failing to ensure that people with disabilities have access to, are permitted to participate in, and are not denied the benefits of programs, services, and activities provided by Defendant County. 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

146. Defendant County violates the ADA by failing to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . . ." 28 C.F.R. § 35.130(b)(7)(i).

147. Defendant County violates the ADA by failing to "furnish appropriate…services where necessary to afford individuals with disabilities ... an equal opportunity to participate in ...

a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

148. Defendant violates the ADA by failing to notify people about their rights under the ADA while detained in its detention centers. 28 C.F.R. § 35.106.

149. Defendant County violates the ADA by failing to "adopt and make accessible grievance procedures" that provide disabled inmates with the opportunity for 'prompt and equitable resolution of complaints alleging any action that would be prohibited by ... the ADA,' including excessive and statutorily violative terms of solitary confinement. 28 C.F.R. § 35.107(b).

150. As a result of Defendant County's policies and procedures regarding individuals with disabilities in OCSO's Justice Center, Elijah and other psychiatric and mentally disabled inmates are unnecessarily placed in solitary confinement for excessive and constitutionally and statutorily infirm terms and conditions solely on account of their disabilities and thus, are denied equal access to the Justice Center's activities, programs and services for which they are otherwise qualified.

151. As a direct and proximate result of the actions of Defendant Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe, Elijah suffered and sustained damages for having to endure constitutional and statutory harms that resulted in: lasting and permanent damage to his neurological functions including concussion syndrome, severe and chronic headaches, memory lapses, balance and equilibrium dysfunction, hearing loss, nerve damage, dizziness, inner ear abnormalities, mental and emotional distress, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, deterioration of eyesight. hallucinations, anxiety, nervousness, mental and emotional distress, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, , humiliation, fear, concentration

deficits, memory diminishment, illusions, social withdrawal, confusion,

## SIXTH CAUSE OF ACTION
### Violation of Civil Rights Law
### 42 U.S.C. §1983
### Municipal Liability
### (Against County of Onondaga)

152. Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

153. In subjecting Elijah to excessive force, retaliation for exercising his right to seek redress for grievance, excessive terms of solitary confinement that would pose him a substantial risk of significant psychological harm, and disability discrimination, Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsysthe had violated Elijah's clearly established rights under the Eighth, Fourteenth, Americans with Disabilities Act, and N.Y.S. HALT act.

154. The unconstitutional actions and/or omissions of Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsysthe, as well as other deputies and supervisors employed by or acting on behalf of Defendant County, were, upon information and belief, perpetrating the following customs, policies, practices, and/or procedures of the COUNTY, which were directed, encouraged, permitted, and/or ratified by County supervisors, including its final policymaker, County Sheriff Tobias Shelly with respect to its County correctional facilities, including the Justice Center, to wit:

   a. The use or toleration of the use of excessive and/or unjustified force in violation of the Eighth Amendment when responding to inmate suicide attempts, engagements in self-harm, overcome by mental health crises, incidents warranting a code blue response, etc as a means of instilling punishment and deterrence to disabled inmates who, on account of their mental illness have succumbed to serious mental crises. In addition, such practice of excessive force was deployed

institutionally wide as an overall practice to instill compliance with institutional regulations and to ensure compliance through fear and terror in patent violation of the rights afforded inmates under the United States Constitution;

b.    The use or toleration of the use of constitutionally and statutorily infirm excessive terms and conditions of solitary confinement in violation of the Eighth Amendment, Americans with Disabilities Act, and N.Y.'s HALT act as a means managing and supervising mentally disabled inmates at the expense of inmates' psychological, emotional, and physiological health and well-being;

c.    The use or toleration of the use of withholding periodic reviews of the excessive terms of solitary confinement such that an inmate would (1) be meaningfully notified as to the types of behavior changes that would have otherwise enabled an inmate to transfer out of solitary confinement and into into less restrictive confinement conditions and (2) an opportunity to respond, participate, or provide additional or updated information to the reviewing body such that meaningful review of the necessity for prolonged solitary confinement was undertaken;

d.    The use or toleration of the use of obstructing and/or withholding timely access to grievance protocols, official grievance forms, etc., in order to enable the filing of timely grievances and/or complaints of excessive force or unjustified force, excessive terms and unlawful conditions of solitary confinement, disability discrimination, deputy threats, harassments and intimidation, and/or other conditions that are in violation of the First, Fourteenth and Eighth Amendments to the United States Constitution;

e.    The use or toleration of the use of retaliation as a means of instilling a chilling effect upon an inmate's exercise of his or her First Amendment rights to petition a court and/or redress grievances within the correctional institution;

f.    The use or toleration of the use of discriminatory animus in denying disabled inmates with an equal opportunity to participate in the Justice Center's 'services, programs, or activities,' including the institution's grievance process, the process for determining the imposed sentence, the sentences, terms and conditions for solitary confinement, the provision of timely and meaningful reviews to determine the continuing necessity for solitary confinement, and recreation and out-of-cell time;

g.    Covering up the above enumerated conduct by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful supervisory and/or deputy conduct;

h.    Failing to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning the reasonable use of force when the need for such training, supervision, policies, and procedures is obvious;

i.  Failing to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning the rights of disabled inmates with respect to provision of accommodations in order to provide equal access to Justice Center activities, programs and services for which disabled inmates are otherwise qualified;

j.  Allowance, toleration, and/or encouragement of a "code of silence" among Justice Center OCSO deputies whereby a deputy and/or supervisory staff refrains from providing adverse information against a fellow deputy or supervisory staff in order to ensure that official misconduct is remedied;

k.  Failing to have and enforce necessary, appropriate, and/or lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a)–(k) above, in the face of an obvious need for such policies, procedures, and training programs, and with deliberate indifference to the rights and safety of Elijah and the public.

155.    Defendant County failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsysthe and other County personnel, with deliberate indifference to Elijah's constitutional rights, which were thereby violated as described above.

156.    The unconstitutional actions and/or omissions of Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsythe, as described above, were approved, tolerated and/or ratified by the County and County Sheriff Defendant Tobias Shelly as OCSO's final policy maker. Elijah is informed and believes, and thereupon alleges, that the details of Elijah's detention as communicated through his grievances and complaints, in particular to County Sheriff Shelly have been revealed to the authorized policy makers within Defendant County, and that such policy makers have direct knowledge of the facts of the incidents articulated in this complaint.

157.     Notwithstanding this knowledge, the authorized policy makers within Defendant County has approved of the conduct of Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsythe and have made a deliberate choice to endorse the decisions of Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsythe and the basis for those decisions. By so doing, the authorized policy makers within Defendant County, including its final policymaker with respect to the OCSO and its operation of County corrections facilities, including the Justice Center have shown affirmative agreement with Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsythe's conduct throughout the approximate 137 days of Plaintiff Elijah Vreeland's detention at the Justice Center and have ratified the unconstitutional acts of the individually named Deputies and Supervisors.

158.     The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; as well as the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct by the County and its final policymaker, Chief Tobias Shelly was a moving force and/or a proximate cause of the deprivations of Elijah's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above

159.     Defendant Deputies Apples, Hujdur, Fodaro, Saddock, Chief Drapikowski, Hearing Officer Kolakowski, Senior Deputy McDonald, and Deputies Cruz and Forsythe's subjected Elijah to their wrongful conduct, depriving him of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Elijah

and others would be violated by their acts and/or omissions.

160.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendant County, as described above, Elijah suffered and continues to suffer: lasting and permanent damage to his neurological functions including concussion syndrome, severe and chronic headaches, memory lapses, balance and equilibrium dysfunction, hearing loss, nerve damage, dizziness, inner ear abnormalities, hallucinations, anxiety, nervousness, mental and emotional distress, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, , humiliation, fear, concentration deficits, memory diminishment, illusions, social withdrawal, confusion, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight

## STATE CLAIMS

## SEVENTH CAUSE OF ACTION
**Wrongful Confinement in violation of HALT ACT,
NY Correction Law § 137, et seq.
(Chief Drapikowski, Hearing Officer Deputy Kolakowski,
Deputies McDonald,  Cruz, and Forsythe)**

161.    Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

162.    Elijah had duly complied with all conditions precedent, including filing of a Notice of Claim under General Municipal Law § 50-e with Defendants County on or about May 7, 2024 which was then supplemented on or about July 24, 2024.

163.    In 2021, the New York State Legislature dramatically curtailed the permissible use of solitary confinement in the state's prisons with the historic passage of the HALT Act ("Humane Alternatives to Long-Term Solitary Confinement Act"). The HALT act amended  the

New York Correction Law to curtail the use of solitary confinement in New York's prisons. *See*, NY Corrections §137, *et seq*. In so doing, the Legislature responded to sustained calls from citizens and survivors and recognized the medical and scientific consensus concerning the devastating effects of solitary confinement has on people with disabilities, including the increased risk of self-mutilation and suicidal ideation, enhanced anxiety, depression, and paranoia.

164.    A key purpose of HALT was to protect particularly vulnerable populations from solitary confinement of any kind or duration. Indeed, the Legislature made plain that one of its objectives in passing HALT was to "end the segregated confinement of vulnerable people," because "segregated confinement can be particularly devastating for certain vulnerable people, such as people with disabilities or with trauma histories.[17]

165.    Therefore, under the HALT act, it is mandated that members of the special populations, including people with disabilities, are prohibited from being placed in segregated confinement for *any length* of time. Correction Law § 137 (6)(h). The law defines special populations as including "any person . . . (c) with a disability defined under Executive Law § 292 (21) as "(a) a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevents the exercise of a normal bodily function or is

---

[17] The average amount of time in solitary confinement that people in Mental Health Units receive are 8.45 times higher than the rate for the entire DOCCS population. It has been found that a large number of inmates housed in mental health units are disciplined with solitary confinement sanctions for conduct that may be manifestations of their mental illnesses. This includes conduct described as lewd or labeled aberrant or disruptive, but not violent. Upon charges for unhygienic acts, lewd conduct, or disruptive behavior, mentally disabled inmates received sanctions of solitary confinement at a rate "59 times higher than non-disabled inmates facing the same charges. Thus, prison officials generally respond to people exhibiting signs of mental health disabilities by issuing disciplinary infractions and placing them in solitary confinement which in turn, lead inmates with mental health disabilities to deteriorate further and have even less ability to comply with prison rules." Punishment of People with Serious Mental Illness in New York State Prisons: An Analysis of 2017-19 Disciplinary Data in Prison Residential Mental Health Treatment Units
https://drive.google.com/file/d/16yzZ-LJ8-JwVBvG3ptPlfu6kUfJw01CL/view

demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment. *Id.*

166.    While correctional institutions like the Justice Center tend to exceedingly narrow HALT's definition of disability, institutional designations such as 'serious mental illness' that comprise such disabilities as schizophrenia and bipolar disorder I and II belie such limitation.

167.    Nevertheless, while HALT prohibits mentally disabled inmates from solitary confinement for any length of time, the law, in defining solitary confinement as as any form of cell confinement for more than 17 hours a day, makes plain that non-disabled inmates are <u>not </u>to be subjected to confinement for more than 17 hours per day. Correction Law § 2(23).

168.    Similarly, HALT prohibits an institution's reliance upon single person "recreation pens," i.e., pens accessed through a door in an individual's cell and surrounded by concrete walls or fencing on three or four sides, as sufficiently constituting 'out-of-cell time' for purposes of conforming with HALT's confinement limitations.

169.    Elijah is both an individual with a disability as defined by Executive Law § 292 (21), and designated as having a 'serious mental illness' as defined by DOCCS Directives 4933 and 4933D.

170.    As such, the HALT act prohibited Defendants' Sheriff Shelly, Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe from holding Elijah in solitary confinement for any period of time, let alone in excess of seventeen hours per day. Defendants had nonetheless placed Elijah in solitary confinement for a period of 131 days as that term is defined by Correction Law § 2 (23) and kept him confined for upwards of 20 to 21 hours per day. In so doing, Defendants' actions had expressly violated Correction Law § 137 (6) (h).

171. As a direct and proximate result of the actions of Defendant Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe, Elijah suffered and sustained damages for having to endure constitutional and statutory harms that resulted in psychological damages that manifested and continue to manifest in: mental and emotional distress, hallucinations, anxiety, nervousness, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, concentration deficits, memory diminishment, illusions, social withdrawal, confusion, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight.

172. Elijah is further informed and believe that the acts and/or omissions of Defendants' Chief Drapikowski and Deputies, McDonald, Cruz, and Forsythe were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

**EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(Deputies Apples, Hujdur, Fodaro, Saddock Chief**
**Drapikowski, Hearing Officer Deputy Kolakowski, Deputies**
**McDonald, Cruz, and Forsythe)**

173. Elijah repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

174. Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe's conduct directed at Elijah was so outrageous and shocking that it exceeded all reasonable bounds of decency tolerated by the average member of the community

175. Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski,

Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe acted with the desire to cause Elijah mental distress and/or acted under circumstances known to them which made it substantially certain that he would cause such mental distress.

176. Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe acted with utter disregard of the consequences of their individual actions.

. 177. As a direct and proximate result of the actions of Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe, Elijah suffered and continues to suffer: lasting and permanent damage to his neurological functions including concussion syndrome, severe and chronic headaches, memory lapses, balance and equilibrium dysfunction, hearing loss, nerve damage, dizziness, inner ear abnormalities, hallucinations, anxiety, nervousness, mental and emotional distress, nightmares, panic attacks, irrational anger, rage, paranoia, severe and chronic depression, an unceasing sense of doom and misery, , humiliation, fear, concentration deficits, memory diminishment, illusions, social withdrawal, confusion, migraines, insomnia. heart palpitations, back and joint pain, tremulousness, and deterioration of eyesight

178. Elijah is further informed and believe that the acts and/or omissions of Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe were intentional, malicious, oppressive and/or done with a conscious or callous disregard for Elijah's safety and/or constitutional rights which thereby justifies an award of punitive or exemplary damages in amounts to be determined according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiff Elijah Vreeland requests relief as follows:

a. Adjudge and declare that the conditions, acts, omissions, policies and practices of Defendant County of Onondaga and its agents, officials, and employees, including Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe are in violation of Plaintiff Elijah Vreeland rights under the First, Eighth and Fourteenth Amendments to the U.S. Constitution and the Americans with Disabilities Act;

b. Award Elijah Vreeland compensatory and economic damages in the amounts that are fair, just and reasonable to be determined at trial;

c. Award Elijah Vreeland damages, both individually and severally, against Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount of $2,500,000.00.

d. Award Elijah Vreeland punitive damages against Defendant Deputies Apples, Hujdur, Fodaro, Saddock Chief Drapikowski, Hearing Officer Deputy Kolakowski, Deputies McDonald, Cruz, and Forsythe individually in the amount of $2,500,000.00. for the protection of the public.

e. Award Plaintiffs, pursuant to 42 U.S.C. § 1988, and 42 U.S.C. §§ 12205, 12133, and other applicable law, the costs of this suit pursuant to 42 U.S.C. §§ 1920 and reasonable attorneys' fees and litigation expenses;

f. Pre-judgment and Post-judgment interest; and

g. Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: May 14, 2025                                    Respectfully Submitted,

                                                       **LAW OFFICES OF ERIC SEIFERT**

                                                       */s/ Eric Seifert*
                                                       Eric Seifert, Esq.
                                                       *Attorney for Plaintiff*
                                                       *Elijah Vreeland*

**LAW OFFICES OF ERIC SEIFERT**
Eric Seifert, Esq.
36 Sutton Place South, 13th Floor
New York, New York 10022
Telephone: (917) 543-9464
ericseiferlaw@gmail.com
*Attorney for Plaintiff*
*Elijah Vreeland*